**APA INTERNATIONAL FILM DISTRIBUTORS, INC.,**
Plaintiff,

v.

**CORPORACION DE PUERTO RICO PARA LA DIFUSION PUBLICA,**
et al., Defendants

No. Civ. 01–2619(JP).

United States District Court,
D. Puerto Rico.

July 7, 2005.

Jane A. Becker–Whitaker, Jane Becker Whitaker, PSC, San Juan, PR, for Plaintiff.

Luis E. Padron–Rosado, Luis Sanchez–Betances, Sanchez Betances & Sifre, P.S.C., Juan M. Casellas–Rodriguez, McConnell Valdes, Carlos M. Aquino–Ramos, Fiddler, Gonzalez & Rodriguez, San Juan, PR, for Defendants.

## OPINION AND ORDER

PIERAS, Senior District Judge.

### I. INTRODUCTION

Before the Court is Plaintiff's "Motion for Partial Summary Judgment and Memorandum of Law in Support Thereof" (**docket No. 58**); Defendants' opposition thereto (**docket No. 76**); and Plaintiff's reply thereto; as well as Defendants' "Motion for Summary Judgment" (**docket No. 83**); and Plaintiff's opposition thereto (Docket No. 95).

APA Film Distributors ("APA") brings the instant action against Defendants Corporación de Puerto Rico para la Difusión Pública ("Corporación") and its Board of Directors, alleging that Defendants breached a contractual agreement with Plaintiff, and that the breach caused a loss of professional reputation, in violation of 31 P.R. Laws Ann. §§ 3391–3525. Originally, Defendants in the case were Corporación and the members of its Board of Directors. On March 11 and 19, 2004, the Court dismissed with prejudice the claims against all Board members except Linda Hernández.

Plaintiff APA is in the business of providing television programming materials to Defendants, who then broadcast these materials on a public television station in Puerto Rico. According to Plaintiff, Defendants breached contracts with Plaintiff when they unilaterally cancelled the contracts. According to Defendants, the contracts at issue are unenforceable for a variety of reasons, including the fact that they lacked the funds to comply with them.

Plaintiff asked this Court to grant partial summary judgment on the limited claim of breach of contract on two grounds: (1) that the reasons purported by Corporación for the cancellation effected by them were not agreed upon in the contract, and were therefore invalid; and (2) that even if the reasons were valid, co-Defendant Hernández acted ultra vires when she cancelled the contracts without the Board's authority.

Defendants' arguments form the basis of both their opposition to Plaintiff's motion for partial summary judgment as well as their own motion for summary judgment. Defendants' arguments are fourfold: that (1) the contracts illegally compromised Corporación's budget for future years, and were therefore null and void *ab initio;* (2) that Plaintiff did not have the licenses to deal and distribute the programs that were subject of the agreements and therefore violated the agreements themselves in this and other matters; (3) that due to government budget cuts which forced Corporación to cut programming, Corporación lacked funds to comply with the contracts; and (4) that the cancellation of the contracts at issue did not require approval by

Corporación's Board of Directors. The Court finds that there are genuine issues of material fact as to all the allegations brought by the parties, and therefore **DENIES** both motions for summary judgment.

## II. LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate where, after drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of material fact for trial. *See Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993). A fact is material if it might affect the outcome of the case. *Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989). An issue is "genuine" if sufficient evidence exists to permit a reasonable trier of fact to resolve the issue in the non-moving party's favor. *See Boston Athletic Ass'n v. Sullivan,* 867 F.2d 22, 24 (1st Cir.1989).

The party filing a motion for summary judgment bears the initial burden of proof to show "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to show affirmatively, through the filing of supporting affidavits or otherwise, that a genuine issue exists for trial. *See Goldman v. First National Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993). In discharging this burden, the non-moving party may not rest upon mere allegations or denials of the pleadings. *See* Fed. R.Civ.P. 56(e). On issues where the non-moving party bears the ultimate burden of proof, it must present definite, competent evidence to rebut the evidence put forth by the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256–257, 106 S.Ct. 2505, 2514–2515, 91 L.Ed.2d 202 (1986). Indeed, summary judgment may be appropriate "... where elusive concepts such as motive or intent are at issue ... if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994).

## III. FINDINGS OF FACT

After thoroughly evaluating the facts presented by the parties and the record as a whole, the Court makes the following findings of fact.

1. Plaintiff is a corporation with its principal place of business in Miami, Florida.

2. Co–Defendant Corporación is a corporation with its principal place of business in San Juan, Puerto Rico.

3. All Defendants are domiciled in Puerto Rico.

4. The Corporación's by-laws have not been amended since October 23, 1997.

5. In December 1999, APA entered into contract number 1948/99 with Corporación for a price of $388,000.00.

6. In December 1999, APA entered into contract number 1950/99 with Corporación for a price of $72,000.00.

7. In December 1999, APA entered into contract number 1951/99 with Corporación for a price of $209,600.00.

8. In December 1999, APA entered into contract number 1952/99 with Corporación for a price of $64,600.00.

9. All the aforementioned contracts are dated December 14, 1999 and are all signed by Rafael Fusaro (APA President); Jorge Inserni (Corporación's

former President); and Carmen Méndez (APA's Resident Agent).

10. On December 14, 1999, Corporación also signed an addendum to the above listed contracts, signed by Rafael Fusaro (APA President) and Jorge Inserni (Corporación's former President).

11. In the addendum, Corporación recognized that APA was reserving material and agreeing not to sell that material to third parties, all for the benefit of Corporación.

12. The aforementioned contracts in question covered fiscal years 1999/2000, 2000/2001, 2001/2002 and 2002/2003.

13. Contracts 2000–00049, 2000–00050, 2000–00051 and 2000–00052 are dated May 8, 2000, and are signed by Carmen Méndez (APA's Resident Agent) and Jorge Inserni (Corporación's former President).

14. The Addendum to Contract numbers 1948/99, 1950/99, 1951/99 and 1952/99 contains a statement which establishes that "[a]ll of the contracts are subject to the condition that sufficient funds be assigned to the Corporation in its Budget, and that those funds be disbursed."

15. The Addendum to Contracts also contains a statement which establishes that "[i]t is specifically recognized that the Corporation is not authorized to [commit], nor is it, committing future budgets."

16. The programs in Contract 1948/99 were purchased by APA from Rose Entertainment at a cost of $116,000.

17. The programs in Contract 1948/99 were being sold to Corporación for $388,000.

18. The programs in Contract 1951/99 were purchased by APA from Rose Entertainment at a cost of $56,216.

19. The programs in Contract 1951/99 were being sold to the Corporación for $209,600.

20. The programs in Contract 1952/99 were purchased by APA from Rose Entertainment at a cost of $17,220.

21. The programs in Contract 1952/99 were being sold to the Corporación for $64,600.

22. The programs in Contract 1950/99 were being sold to the Corporación for $36,000.

23. The Annex to Contracts corresponding to Contracts 1948/99, 1950/99, 1951/99 and 1952/99 contains a SECOND CLAUSE, which establishes that Corporación may terminate the contract, giving a 30–day notice, "when a change in circumstances beyond the actions or will of the CORPORATION makes the execution of that which is agreed upon excessively onerous and unjust for the CORPORATION."

24. The SECOND CLAUSE of Contracts 1948/99, 1950/99, 1951/99 and 1952/99 also establishes that, should Corporación cancel for the reason stated in the clause, "the CORPORATION would then only be obligated to pay the DISTRIBUTOR for the programs acquired up to the date in which the accelerated termination becomes effective".

25. APA's President, Rafael Fusaro, understands the term "onerous" to include situations when "the prices are excessively high for what is being offered, high and unjust."

26. The Annex to Contracts corresponding to Contracts 1948/99, 1950/99, 1951/99 and 1952/99 contains a THIRD CLAUSE which states that "[t]he negligence or noncompliance of their [the contracting parties'] obligations shall constitute sufficient cause for considering this contract as immediately ended, without requiring more than five (5) days prior notice."

27. Contracts 1948/99, 1950/99, 1951/99 and 1952/99 contain a SECOND CLAUSE, which establishes that "THE DISTRIBUTOR guarantees that he has an absolute right to confer the license that by the present document he grants."

28. Contracts 1948/99, 1950/99, 1951/99 and 1952/99 establish a set exhibition term of two (2) years, beginning July 1, 2000.

29. Contracts 1948/99, 1950/99, 1951/99 and 1952/99 establish that APA was selling to Corporación "unlimited" repetitions and "unlimited" exhibitions for the programs.

30. Per the terms of the contracts, the obligation of payment was only upon delivery of the material and after Corporación had evaluated the materials, which was a requirement.

31. On May 10, 2000, APA's President, Rafael Fusaro, wrote to Corporación's former Director of Programming, José Ferreras, that the programs for Contracts 1948/99 and 1950/99 were ready, but that nothing from Contracts 1951/99 or 1952/99 could be delivered yet by APA.

32. On May 18, 2001, Mr. Fusaro informed Corporación's Daniel Villanueva that the programs for Contracts 1948/99, 1951/99 and 1952/99 were ready for delivery, but that the programs for Contract 1950/99 would not be available until December 2001.

33. On June 5, 2001, Mr. Fusaro informed Vilma Reyes, Programming Director for Corporación, that the programs for Contracts 1948/99 and 1951/99 were ready for delivery, but that the dubbed version of the programs in Contract 1950/99 and all of the programs in Contract 1952/99 would not be available until September 2001.

34. Corporación never requested delivery of the material in contract number 1952/99.

35. On July 6, 2001, Mr. Fusaro informed Ms. Reyes that the programs for Contracts 1948/99 and 1951/99 were ready for delivery, but that the programs for Contracts 1950/99 and 1952/99 would not be available until September 2001.

36. On July 31, 2001, Corporación, through Ms. Reyes, sent Mr. Fusaro a letter indicating that, due to "drastic" budget cuts for acquired programming for fiscal year 2001–2002, Corporación could not undertake the cost of Contracts 1951/99 and 1952/99.

37. The July 31, 2001 letter also stated that Corporación was interested in renegotiating several items of Contract 1948/99 and that such renegotiation would be subject to the evaluation and acceptance of the material.

38. The July 31, 2001 letter also stated that Corporación was committed to comply with Contract 1950/99 in its entirety.

39. On August 10, 2001, Mr. Fusaro informed Ms. Reyes that APA would not be able to comply with Contract 1950/99 because the programs that were part of said contract had been taken off the market by their producer.

40. One reason given by Defendants for the cancellation of the contracts in question was a reduction in its budget.

41. The Puerto Rico Senate approves a global budget number for Defendants every year.

42. Defendants' budget was reduced by $873,000.00 in fiscal year 2001.

43. Linda Hernández, then-President of Corporación, reported to the Board of Directors that Corporación's budget had been cut by 4.17% at the February 21, 2002 Board meeting.

44. At the same meeting, Mr. Villanueva reported that Corporación's budget had increased by $344,000.00.

45. At some point during the life of the contracts in question, Defendants changed their programming objectives.

46. APA has been conducting business with Defendants since approximately 1979–1980.

47. APA's President, Rafael Fusaro, has been conducting business with Defendants since Channel 6 was founded.

48. Corporación has approximately 40 contracts filed with the Comptroller's Office since January 2001 which have a term greater than one year.

49. Seventeen of these contracts with terms of greater than one year extend into the next administration, i.e. beyond January 2005.

50. For the period encompassing the fiscal year July 2001 through June 2002, Corporación had outside contracts with a value totaling $14,953,314.14.

51. The Office of Budget and Management almost never approved the money needed by Corporación during the time Daniel Villanueva worked with the preparation of budgets, from September 1992 up until May 2003.

52. In May 2003, Corporación was operating at a deficit and had requested a special appropriation to solve that problem.

## IV. CONCLUSIONS OF LAW

### A. *Contract Nullity*

Defendants argue that the contracts in question were null and void, since they committed public funds from future budgets, in contravention of the law. Plaintiffs counter that not only do many government agencies in Puerto Rico contract for terms for more than one year, Corporación and its counsel representing them in this very case have, on many occasions, contracted in violation of this law.

Puerto Rico law states, in its relevant portion, that: "The contracting parties may make the agreement and establish the clauses and conditions which they deem advisable, provided they are not in contravention of law, morals or public order." 31 P.R. Laws Ann. § 3372. Courts interpreting this section have held that ... "In interpreting the provisions of this section—which requires that contracts not be contrary to the public order—it cannot be ignored that in a State contract, the sane and correct administration of public funds is linked to the highest public interest and

all government organs are obligated to comply with the essence of the constitutional provisions requiring that public funds only be spent for legitimate public ends". *de Jesus Gonzalez v. Autoridad de Carreteras,* 148 P.R. Dec. 255, 1999 WL 274163 (1999). Likewise, it has been held that ... "the binding nature of the pacts and conditions imposed by the principal document cannot violate provisions of law or be contrary to public order." *Cond. Prof. S.J.H. Centre v. P.R. F., Inc.,* 133 P.R. Dec. 488 (1993).

The statute in question provides as follows:

(a) All appropriations and funds authorized for the expenditures of a fiscal year shall be applied exclusively to the payment of expenses lawfully incurred during the respective year, or to the payment of obligations legally contracted and duly entered in the books of said year, except for what is provided in subsection (c) of this section.

(b) No amount shall be spent or pledged in one fiscal year that may exceed the appropriations and funds authorized by law for said year, including the amounts transferred to be credited to said appropriations and the funds by provision of law, nor may the Government be pledged in any way by any contract or negotiation for the future payment of amounts in excess of said appropriations and funds, unless it is expressly authorized by law.

■ The Court understands Defendants' reading of this statute to be that the government can only enter into con-

tracts on a year-to-year basis, and if longer than that, other measures must be undertaken and approvals sought from other governmental bodies. Although this interpretation of this clause fits squarely within the different opinions rendered by the Secretary of Justice regarding this issue,[1] Plaintiffs have presented recent cases interpreting this statute that have found the express opposite of this reading of the law: that even though the law might forbid contracts of longer duration than one year, the Puerto Rico Supreme Court has often refused to hold the very same issue that Defendants herein are espousing: that the contracts are null because they were issued in contravention of the one year budgetary constraints. *See Municipio de Ponce v. Autoridad de Carreteras, et al.,* 2000 T.S.P.R. 194 (P.R.2000); *Municipio de Ponce v. Rossello,* 136 P.R. Dec. 776 (P.R.1994). In these two cases, the Puerto Rico Supreme Court explicitly held that the government was not exempt from its obligations under a contract they had signed merely because the contract compromised future budgets. In light of this reading by the Supreme Court, the Court finds that the contracts at issue were valid. Therefore, the Court **DENIES** summary judgment on this issue.

### B. *Contract Formation*

In the alternative, Defendants next argue that the contracts in question were null and void because they lacked the essential elements of object and cause.

---

1. "Government contracts authorized for a period of more than one year are of an exceptional character and need to be expressly provided for by statute." 1988 Op. Sec. Jus. No. 17; "Government organizations should not approve contracts that are projected beyond the fiscal year in which they are contracted." *Id.* "In fiscal government operations it is gen-

erally understood that only funds appropriated for the economic year in which they are negotiated may be obligated." 1986 Op. Sec. Jus. No. 29; "Government instrumentalities require express legislative action to enter contracts of more than one year's duration." 1981 Op. Sec. Jus. No. 13.

As is well known, under Puerto Rico law, a contract has three requisite elements for its formation, and are binding so long as the essential conditions required for their validity exist: 1) the consent of the contracting parties; 2) a definite object which is the subject of the contract, and 3) the cause for the obligation which may be established. 31 P.R. Laws Ann. § 3391. Regarding consent, the same is shown by the concurrence of the offer and acceptance of the thing and the cause which constitute the contract. 31 P.R. Laws Ann. § 3401. Regarding the object, the Code states that all things, even future ones, which are not out of the commerce of man, may be the object of a contract. 31 P.R. Laws Ann. § 3421. Lastly, regarding the cause, the Code states that the purpose of every contract must be a thing determined with regard to its kind. 31 P.R. Laws Ann. § 3423. Whether or not the object or purpose of the contract is not fully specified is not necessarily an obstacle to the formation of the contract, as long as it may be possible to determine it without the need for a new agreement between the contracting parties. *Id.*

█ Defendants allege that the contracts in question lacked all three elements. They allege they lacked consent because some of them were signed by Ms. Carmen Méndez, APA's resident agent in Puerto Rico, and not by its President or other corporate officer. They allege they further lacked object and cause, since APA would not have been able to comply with them because it did not possess the absolute rights to the programming at the time of contracting.

Again, the Court finds there are genuine issues of material fact regarding this issue. Plaintiffs have presented valid evidence which substantiates their position that Ms. Méndez acted in conformity with the powers delegated to her by APA, which there-fore contradicts Defendants' arguments. Whether she had apparent or actual authority to enter into the contracts at issue on behalf of APA, and if she only had apparent authority, whether her actions were later ratified by APA and Defendants is an issue of fact that is proper only for the jury to decide. This issue also goes to the heart of the controversy of whether or not the contracts, if valid under the law, were properly executed or agreed to by the parties.

Regarding the issues of whether APA possessed the rights to the programming in question, and based on this, whether or not they could comply with the contracts, Plaintiffs have presented clear evidence that squarely contradicts Defendants' stance on these issues. In particular, the Court reminds Defendants of the basic tenets of contract law: that the object can be anything, *even a future object,* and that the cause does not need to be fully specified as long as it *may be possible to determine it* without the need for a new agreement between the contracting parties. These two issues seem to the Court to be at the heart of the determination of whether these contracts had an object (albeit a future one) and a cause (albeit an unspecified one), and are the key to determining whether or not Defendants' argument that APA was selling rights it did not yet possess is valid. This factual determination, like all others, is for the jury to determine. Summary judgment on this issue is not proper and it is therefore **DENIED.**

### C. *The Onerous Contracts*

Defendants' next allegation is that the contracts at issue were unduly onerous, since APA was charging the government an extremely high fee for the programming it was receiving. Plaintiffs counter with evidence of other contractors who

were charging Corporación a much higher rate for their programming.

■ Although the Court agrees with Defendants that there is an important public interest in government contracting, it is also true that it has been well-established by both federal and Commonwealth Courts that when the government contracts with a private party, the contract should be interpreted as if it was a contract between two private parties, and should not be considered an exception. *See Zequeira v. Municipal Housing Auth.*, 83 P.R. Dec. 878, 880–881 (P.R.1961) (citing therein a host of cases for this proposition). Therefore, even though public policy is to be kept in mind in government contracting, so too must the Government bear in mind that it is not above the law or and that it should not receive special treatment merely because it is the government and not a private party.

Again, Plaintiffs have presented evidence that contradicts Defendants' arguments of onerousness. In particular, they have provided evidence of the current cost of programming which Defendants are incurring, which is over fifteen times what Plaintiff was charging Defendants for the programming in the contracts in question. In light if this evidence, the Court cannot decide this issue on its own, and therefore, **DENIES** summary judgment on this issue as well.

### D. *The Contract Cancellations*

Lastly, regarding the reasons for the contracts' cancellation, the Court likewise finds there are genuine issues of material fact surrounding this claim. Defendants have stated that the reason for the cancellation in programming was the three percent (3%) budget reduction that it underwent. As a result thereof, co-Defendants Linda Hernández, then-President of Corporación, cancelled the contracts in question. Plaintiffs have presented evidence to the Court that creates a genuine issue of material fact as to the real reasons behind the cancellation, to wit: statements that Defendants changed their programming mission and therefore, the programming in the contracts was no longer in line with their new policies; and that the budget reduction in question was under Defendants' control and therefore did not affect the funds in question. Further, the fact that the contracts provided a mechanism for cancellation of the contracts under a variety of circumstances, and the determination of whether in fact, those circumstances were present here, are all genuine issues of material fact that go to the heart of the liability debate.

Lastly, there is also a genuine issue of material fact as to whether co-Defendant Linda Hernández was authorized to cancel the contracts in question on behalf of Defendants or whether she acted *ultra vires*. A reading of the by-laws can lead to both these interpretations. All these issues are genuine questions of fact that are necessary to resolve the material conflicting evidence in this case, and which are within the proper realm of the jury. Therefore, the Court **DENIES** summary judgment on these issues as well.

## V. CONCLUSION

For the aforementioned reasons, the Court hereby **DENIES** both motions for summary judgment on all grounds.

**IT IS SO ORDERED AND ADJUDGED.**